# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 19-224 |
| **v.** | |
| **IMAN SEARS** | **OPINION** |

<u>**WILLIAM J. MARTINI, U.S.D.J.**</u>

This matter comes before the Court on Defendant Iman Sears's Motion to Suppress. ECF No. 23. On October 24, 2019, the Court held oral argument and conducted an evidentiary hearing during which Detective Stephen Dellavalle testified. For the reasons set forth below, Defendant's motion is **GRANTED**.

## I. BACKGROUND

On the evening of September 29, 2018, Detectives Dellavalle and Rivera, experienced officers with the Newark Police Department, conducted proactive patrol in an unmarked Ford Crown Victoria, in the City of Newark as part of a caravan. The detectives wore plain clothes except for vests embossed with the word "Police."

At 11:40 p.m., Detective Dellavalle drove east in the westbound lane of Evergreen Avenue from Ross Street toward 839 Frelinghuysen Avenue, a public housing complex listed as Sears's home address. Def.'s Mot. Ex. D, ECF No. 23-4. Detective Dellavalle described the location as "one of the highest crime areas in the City of Newark." While driving, Detective Dellavalle "observed a male wearing all black, except for a white T-shirt, walking away from 839 Frelinghuysen Avenue towards Evergreen Avenue."[1]

---

[1] Detective Rivera did not testify at the October 24, 2019 evidentiary hearing. Rivera was present in the passenger seat when the detectives encountered Defendant Sears in their vehicle and when they approached Sears at the entranceway of 839 Frelinghuysen Avenue. Detective Rivera authored the incident report in the hours immediately following Sears's arrest. In his report, Detective Rivera stated, "As our vehicle approached 839 Frelinghuysen Avenue, our attention was drawn to a black male with dread locks, wearing a black hoodie, black sweatpants, and black boots (later identified as Iman Sears)." Govt.

Detective Dellavalle's view of the courtyard in front of 839 Frelinghuysen Avenue was partially obstructed. Three vehicles were parked on the north side of Evergreen Avenue as the detectives drove by 839 Frelinghuysen Avenue, parallel to the sidewalk. *See* Govt. Ex. 3. One of these vehicles was a white van, parked where the walkway to 839 Frelinghuysen Avenue meets Evergreen Avenue. Directly west of the walkway is a light pole. *Id.* The courtyard in front of 839 Frelinghuysen Avenue contains various trees with full foliage, a park bench surrounded by a wall on three sides, various shrubs about four feet high, and a barred fence. Although Detective Dellavalle's view from his Crown Victoria was partially blocked or obscured by these obstacles, he testified that he could "generally see the walkway pretty well."

Detective Dellavalle observed Defendant Sears about 25 feet away from his lowered driver's side window, and, because of obstructions, was only able to observe the walkway to 839 Frelinghuysen Avenue for several seconds as he drove east on Evergreen. Sears walked away from the building, down the walkway towards Evergreen Avenue. Detective Dellavalle testified that upon seeing the detectives' vehicle, Sears stopped, turned around, allegedly "ma[d]e a quick adjustment towards his waistband and continued walking towards the building," and looked back over his shoulder. The detectives' impression was that Sears observed their vehicle and was "immediately startled." Govt. Ex. 1. Surveillance video does not show that Sears was immediately startled. Instead, the video shows that Sears turned around and walked towards the building.

Dellavalle described Sears's motion towards his waist as "very, very subtle . . . you can't see a dramatic motion; however, you can see a subtle adjustment in the video [Govt. Ex. 3]. Very subtle." Detective Dellavalle testified that he saw Sears reach towards his waistband when Sears was facing away from him, as his vehicle passed between the light pole and white van parked in front of the walkway, which Dellavalle estimated are about five to six feet apart. *See* Govt. Ex. 3 at 23:42:57-60. Detective Dellavalle stated that, "From behind [Sears], you could just see him. From his arm by his side, to go to his waist real quick and back out." The surveillance video is inconclusive as to whether Sears made a motion towards his waistline. Rather, the video footage shows clearly that when Defendant turned and started back towards 839 Frelinghuysen Avenue, Sears lit and smoked a cigarette. Govt. Ex. 3 at 23:43:04-08. Detective Dellavalle did not testify about this on direct examination.

Dellavalle stated that these factors indicated that Sears was nervous, but he also testified that he was too far away to observe whether Sears was sweating or shaking.

Ex. 1. The surveillance video does not show that dread locks were visible when the detectives encountered Sears. To the extent Sears was stopped because he was "a black male with dread locks," the Court explicitly and unequivocally rejects that these facts may ever serve as a basis for reasonable suspicion. Govt. Ex. 1.

Detective Dellavalle testified that Sears's stopping and turning around drew his suspicion because "if someone is doing something illegal and they see the police, they're going to stop and go the other direction" and that "people that carry guns will adjust [their waistbands] if they try to conceal it."

Detective Dellavalle testified that Sears's alleged stopping when he saw the detectives' vehicle, turning around, making a quick adjustment to his waist, and looking over his shoulder, led the detectives to confront Sears. When the detectives parked and exited their vehicle east of the parked white van, they immediately "started running after [Sears] and . . . yelled, 'Police, stop,'" wearing vests embossed with the word "police." Dellavalle testified that Sears saw them, and "sped up" towards the door of 839 Frelinghuysen Avenue. Sears did not respond to detectives' commands to stop immediately, but instead "kept walking towards the door." The incident report states that prior to speaking to the officers, "once at the entrance [of 839 Frelinghuysen Avenue], Sears grabbed the door handle, but was unable to gain entry." The surveillance footage does not show that Sears ever grasped the door handle or that he was unable to gain entry. When the detectives reached Sears, he stopped, turned towards them and said, "I ain't doing shit. Leave me the fuck alone." *See* Govt. Ex. 1. When Dellavalle illuminated Sears's waistline with the flashlight, "[Sears] turned the right side of his body out and . . . bladed it away from me a little bit."

When the detectives got closer to Sears, he fled. Detective Rivera tackled Sears "a couple feet away." Detective Dellavalle recalled that it was a "very quick" chase. Sears resisted arrest and, with the help of other responding officers, Detective Rivera was able to subdue him. A search was conducted, and a handgun was found down his right pants leg. Heroin and crack cocaine were also found on his person. Sears was treated with broken ribs and a collapsed lung. Surveillance video from two cameras at 839 Frelinghuysen Avenue showing the encounter, Government Exhibits 3 and 4, was obtained on October 1, 2018. Govt. Ex 2. On April 1, 2019, Sears was charged in an indictment with violating 18 U.S.C. § 922(g), 21 U.S.C. § 841, and 18 U.S.C. § 924(c).

## II.    DISCUSSION

Sears moves to suppress the gun and drug evidence as fruits of an unlawful search and seizure. "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." *Id*. The government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Police encounters that do not involve coercion or detention do not implicate the Fourth Amendment. *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (citing *United States v. Williams*, 413 F.3d 3347, 352 (3d Cir. 2005) (officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places")). "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Defendant argues that he was seized when detectives initially ordered him to stop and began running towards him. Def.'s Mot. at 8. There are two issues in this case: (1) whether the detectives' conduct qualified as a seizure; and (2) if so, whether the detectives' conduct was supported by reasonable suspicion. *United States v. De Castro*, 905 F.3d 676, 678 (3d Cir. 2018).

## A. Sears Was Seized When He Acquiesced to Detective's Commands to Stop

During a non-consensual stop, police authority rises to the level of a seizure only when a person's freedom is restrained (1) by application of physical force, even when it is ultimately unsuccessful; or (2) a person submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (finding that because defendant did not comply with law enforcement's show of authority, he was not seized until he was restrained by physical force). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.*; *see Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (seizure occurs when "communication would convey to a reasonable person that compliance was not optional"). Factors that indicate that a show of authority amounted to a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

The detectives' seized Mr. Sears when he stopped at the entrance of his building in response to their show of authority. When the detectives exited their vehicle wearing vests embossed with the word "police," ran towards Mr. Sears, and yelled "police stop," a reasonable person would not have felt free to leave. While Mr. Sears did not immediately comply with the show of authority, he only took a few more steps, turned, and began conversing with the officers. At that moment, Mr. Sears was seized.

Sears submitted to the detectives' show of authority. Defendant contends that he was seized when detectives yelled the order "Police stop." Def.'s Mot. at 8. The

Government contends that because Sears did not initially submit to the detectives' commands to stop, he was seized only when he was ultimately detained through use of physical force, namely, when he was tackled. Govt.'s Resp. at 10. There is no submission to authority when a suspect already in motion refuses to stop when approached by an officer. *See United States v. Lowe*, 791 F.3d 424, 433 (3d Cir. 2015). However, when Sears reached the entrance to 839 Frelinghuysen Avenue, instead of entering the building,[2] Sears stopped, turned around to face the two detectives immediately surrounding him, and stated "I ain't doing shit leave me the fuck alone." Govt. Ex. 4 at 23:43:14-18; Govt. Ex. 1. By fully complying with the detectives' commands to stop, Sears submitted to detectives' show of authority and permitted them to effectuate a seizure. As corroborated by the surveillance video, Sears, surrounded by the detectives, had no choice but to submit. Govt. Ex. 3 at 23:43:11-18.[3]

That Sears later fled did not vitiate his prior submission to detectives' commands to stop—a stop, which for reasons stated below, was not supported by reasonable suspicion. *See United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (finding that defendant's initial submission to authority was not undercut by his subsequent attempt to flee); *United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993) (same). Additionally, Sears's attempt to flee did not terminate the seizure. While Sears attempted to terminate his submission to the detectives' authority and end the stop by running, he was immediately restrained through use of physical force. Detective Dellavalle testified that Sears was tackled "a couple feet away" and that it was "very quick." The detectives made immediate contact with Sears as he began to flee, and because he was immediately surrounded by the detectives, any attempt to flee would have been futile. *See* Govt. 4 at 23:43:20. The Court

---

[2]     The incident report states, "Once at the entrance [of 839 Frelinghuysen Avenue], Sears grabbed the door handle, but was unable to gain entry." Govt. Ex. 1. Surveillance video shows that while Sears quickly extended his hand to open the door, he did not grasp the door handle. Govt. Ex. 4 at 23:43:14-15. The Court finds that Sears elected not to enter the building.

[3]     Sears's submission amounted to more than the momentary hesitation before successful flight that the Third Circuit has found insufficient submission to authority to constitute a seizure. *See United States v. Valentine*, 232 F.3d 350, 359 (3d 2000) (defendant's pausing and giving his name after officers ordered him to place his hands on vehicle was insufficient submission to authority). Here, Sears fully complied with the detectives' commands by stopping. Sears turned around to face the approaching officers, attempted to converse with the detectives and dispel suspicion, and fled only when Detective Dellavalle shined a light on him and extended a hand to begin a pat down. Govt. Ex. 1, Govt. Ex. 4 at 23:43:16-18.

finds that once detectives surrounded Sears, they exhibited sufficient control over him to constitute a seizure.

In sum, by engaging in aggressive conduct over a short duration and quickly surrounding Sears, the detectives effected an encounter from which no reasonable person would have felt free to leave, from the episode's outset until its conclusion. This is a seizure under the Fourth Amendment.

### B. The Detectives' Conduct was Not Supported by Reasonable Suspicion

Reasonable suspicion is an "elusive concept," but it demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity," and more than a "suspicion or hunch." *United States v. Cortez,* 449 U.S. 411, 417-18 (1981); *United States v. Sokolow*, 480 U.S. 1, 7 (1989). "In evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common-sense judgments about human behavior.'" *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). "[A] suspect's conduct in the interval between the show of authority and the submission can be considered in determining the reasonableness of the eventual seizure." *United States v. Lowe*, 791 F.3d at 431.

#### 1. Assuming *Arguendo* the Court Accepts Detectives' Testimony, They Did Not Have Reasonable Suspicion to Seize Sears

Detective Dellavalle testified that the following sequence of observations led the detectives to conduct an investigatory stop: (1) Sear's stopping when he saw the detectives' vehicle, (2) his turning away from the detectives' vehicle, (3) his quick adjustment to his waist, and (4) his looking over his shoulder towards the detectives. Additionally, the detectives' determination was based on Sears's presence in a high crime area.

Where a defendant's lifting or adjusting motion towards his waistline is a basis for reasonable suspicion, there is generally also an indication that an object is present. *See e.g.*, *United States v. Terry*, 518 Fed. Appx. 125, 127 (3d Cir. 2013) (defendant observed grabbing item from vehicle, then making shoving motion towards waistband); *Spears v. Leporace*, 449 Fed. Appx. 187, 190 (3d Cir. 2011) (observation of defendant adjusting an unknown item similar to a gun in his waistband established reasonable suspicion); *United States v. Samuels*, 131 Fed. Appx. 859, 862-63 (3d Cir 2005) (visible bulge in defendant's waistband and gestures towards waist bases for reasonable suspicion). In limited circumstances, only after officers directly confront a defendant and order him to stop making movements towards his waistband does doing so without indication of an item constitute a basis for reasonable suspicion. *See United States v. Waller*, 665 Fed. Appx. 150, 153 (defendant made furtive gestures toward his left waistband despite being repeatedly ordered to keep his hands on the dashboard); *United States v. Focareta*, 283

Fed. Appx. 78, 83 (3d Cir. 2008) (defendant continued to reach for his waistband despite officers' requests to cease). Here, even assuming that Detective Dellavalle observed Sears making an adjusting or lifting motion towards his waistband, it is too innocuous and frequent an occurrence, without indication of something more—presence of an item or refusal to comply with officers' demands to cease furtive movements—to suggest that criminal activity is afoot.[4]

"Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area." *United States v. Valentine*, 232 F.3d 350, 357 (2000). "The person approached . . . need not answer any questions put to him; indeed he may decline to listen to the questions at all and may go on his way," and "his refusal to listen or answer does not, without more, furnish" the grounds for reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 497-98 (1983). While the incident report states that Sears was startled upon seeing the detectives' vehicle, the surveillance video instead shows Sears turning around, walking back towards 839 Frelinghuysen Avenue, and lighting a cigarette. Considering the lack of other evidence suggesting that Sears was nervous, or that a reach towards his waistband could have been related to his smoking a cigarette, walking away from officers is insufficient to establish reasonable suspicion.[5]

The Court, however, considers the totality of the circumstances, not each fact in isolation. *Navedo*, 694 F.3d at 468, 470. Resolving all factual issues in favor of the Government, an individual walking away from police and making some motion towards his waistband at night outside of his home, albeit, in a high-crime area, without more, does not create reasonable suspicion sufficient to detain Sears. While the Court recognizes that legal, innocent acts may together amount to reasonable suspicion, the record is devoid of additional evidence suggesting that criminal activity was afoot. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968).

---

[4] While nervous and evasive behavior is a pertinent factor in determining reasonable suspicion, Dellavalle testified that he was too far away to observe whether Sears was sweating or shaking. *Wardlow*, 528 U.S. at 124.

[5] "Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but . . . believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." *Wardlow*, 528 U.S. at 132 (Stevens, J., concurring in part and dissenting in part).

### 2. The Detectives Could Not Have Clearly Viewed Sears's Conduct, Undermining Any Basis for Reasonable Suspicion

"The ultimate question is whether a reasonable, trained officer standing in [Detective Dellavalle and Riveras's] shoes could articulate specific reasons justifying [Sears's] detention." *Brown*, 448 F.3d at 246. The Court finds that because of the circumstances, it is highly unlikely that any officer, however experienced, would have been able to observe the reported indicia of suspicious behavior with sufficient reliability to establish reasonable suspicion.

Detective Dellavalle testified that the four-feet high shrubs, parked vehicles, and trees, at least partially obscured his view of the courtyard as he drove past in his Crown Victoria. The surveillance video shows that Detective Dellavalle only had a clear line of sight to see Sears for a second or two. *See* Ex. 3 at 23:42:58.389-43:00.391. During this time, the surveillance video does not show whether Sears made an adjustment to his waistband. Detective Dellavalle repeatedly described Sears's movement towards his waistband as "very quick" and "subtle." Detective Dellavalle was the driver and necessarily somewhat attentive to the road.

The Court finds in light of the various obstacles, the detectives' distance from Sears, Sears's facing away from the detectives' approaching vehicle, the short duration within which to view the movement, and subtlety of the movement, a reasonable officer standing in the shoes of the detectives could not have made the purported observations or relied upon those observations, without more, as a basis for justifying detaining Sears.

## III.    CONCLUSION

The Court finds that Defendant Sears was seized on the basis of aggressive police conduct premised on minimal, unreliable observations in violation of the Fourth Amendment. For the foregoing reasons, Defendant Iman Sears's motion to suppress, ECF 23, is **GRANTED**. An appropriate Order accompanies this Opinion.

Dated: December 10, 2019

_____/s/ William J. Martini_____
**WILLIAM J. MARTINI, U.S.D.J.**